UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KENNETH K. CLAMP,

       Petitioner,

  v.

CLARK DUCART,

       Respondent.

Case No. 16-cv-06031-JD

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY**

Kenneth Clamp, a pro se state prisoner, has brought a habeas petition pursuant to 28 U.S.C. § 2254. The Court ordered respondent to show cause why the writ should not be granted. Respondent filed an answer and a memorandum of points and authorities in support of it, and lodged exhibits with the Court. The petition is denied.

## BACKGROUND

A jury found Clamp guilty of first degree felony murder and robbery. *People v. Clamp*, No. H038256, 2014 WL 5499580, at *1 (Cal. Ct. App. Oct. 30, 2014). It was also found that he had two prior serious felony convictions that qualified as strikes. *Id*. He was sentenced to state prison for 75 years to life consecutive to 10 years. *Id*. On October 30, 2014, the California Court of Appeal modified presentence credits for Clamp, but otherwise affirmed the judgment. *Id*. The California Supreme Court denied review on February 11, 2015. Answer, Exs. 3-4. Clamp's state habeas petitions were denied. Answer, Exs. 5-9.

The facts of this case are extensive and complicated, so a brief summary is helpful. The prosecution's theory of the case was that codefendant Skuba planned to use chloroform on the victim, Sorokin, and rob him. *Clamp*, 2014 WL 5499580, at *1. Skuba and another codefendant, Hunt, ultimately beat Sorokin at Skuba's residence until he was unconscious. *Id*. Hunt then left the residence, and Clamp, the petitioner in this case, arrived to help Skuba. *Id*. Clamp and Skuba drove Sorokin to another location where he was thrown off a cliff. *Id*. Clamp, Skuba, and later

Hunt returned to Skuba's residence to divide up the items taken from Sorokin. *Id*. The prosecution's witnesses at trial included four people who were at Skuba's residence when the incident occurred: Kristin Roberts, who was romantically involved with Skuba; Kristin's father, George Roberts, Sr.; Kristin's brother George Roberts, Jr.; and Skuba's friend Timothy Wentzel. *Id*. These witnesses testified inconsistently about many details. *Id*.

The California Court of Appeal summarized the facts[1] of the crime as follows:[2]

**The Prosecution's Case**

**1. Background**

Stewart Skuba lived on Felix Street in Santa Cruz. He sold methamphetamine and marijuana. Skuba and the victim, Elias Sorokin, had known each other for a few years and had done marijuana deals together. The victim had been to Skuba's mother's house a few times.

At the time of the incident in July 2009, Skuba was 31 years old and was "romantically involved" with Kristin Roberts, who was 19 years old. Kristin had known Skuba for about two years and had been living with him for about a month. Prior to that time, Kristin was homeless and unemployed.

Kristin had known defendant Hunt for about two years and defendant Clamp for about a month. She had met both defendants, who were older than her, through Skuba. Skuba had music equipment in his bedroom, and it was common for Hunt to be working on music in Skuba's room during the late night and early morning hours. Hunt sometimes had headphones on while he was working on music.

Kristin testified that Skuba stole checks from a housemate and that she made those checks out to herself, Marjorie Jackson, and another person. Kristin further testified that she pleaded guilty to a felony violation of Penal Code section 4705 in July 2009 in connection with the check case. Kristin's father, George Roberts, Sr., came to Santa Cruz in July 2009 to help her. Senior was trying to save money to rent a place but helped bail her out instead. Skuba did not have money to pay back Senior for the bail but promised to do so. Senior and his son, George Roberts, Jr., began staying at Skuba's Felix Street residence around this time. The residence had three stories, and Kristin lived with Skuba on the first floor, Senior and Junior stayed on the second floor, and college students lived on the third floor.

---

[1] The entire recitation of the facts is known by the parties and is set forth in the state court opinion. *Clamp*, 2014 WL 5499580, at *1-17.
[2] These members of the Roberts family testified at trial. The California Court of Appeal referred to Kristin Roberts by her first name. The court also referred to her father George Roberts, Sr. and her brother George Roberts, Jr. as Senior and Junior.

### 2. The Night of July 20, 2009
#### a. Kristin Robert's Testimony

In July 2009, Kristin was an "extreme alcoholic" who drank as soon as she woke up and until she went to sleep. She had also been using methamphetamine daily for about five years. When she was under the influence of methamphetamine, Kristin was sometimes unintelligible and experienced delusional thinking and paranoia. She also smoked marijuana from time to time.

At trial in July 2011, Kristin testified that she had "done a 360" from where she had been in her life. She was clean and sober for more than a year, and was a born-again Christian and a mother. She had also pleaded guilty to robbing Sorokin. Under an agreement with the district attorney's office, she faced a potential term of up to five years in prison. Other counts in the case against her were dismissed, including a count for being an accessory after the fact, and a misdemeanor case and violations of misdemeanor probation in other cases against her were also dismissed. One of the conditions of the agreement was that she testify truthfully in any proceeding concerning the case. Her testimony was also to be considered with respect to the resolution of the check case in which she had violated probation. She was currently serving a prison sentence for causing injury while driving under the influence.

Kristin initially testified at trial that, days before the incident, she asked Skuba about a black container that she saw in his bedroom. Skuba stated that it was chloroform, and that he was going to use it to knock out a person who was coming from another city. Skuba indicated that the person had a lot of "weed" or a lot of money, and that he was going to "jack" the person, meaning take whatever the person had. Hunt was also present in the bedroom, but Kristin did not remember him saying anything. On the day of the incident, Skuba again told Kristin that a person was coming from another city, that chloroform was going to be used to knock the person out, and that Skuba was going to take money from the person.

Kristin subsequently testified at trial, after reviewing her prior statement to investigators, that Skuba did not mention robbing the person until the day of the incident and that defendant Hunt was not present during the conversation. She also testified that Skuba never talked about chloroform in relation to robbing the person; he only indicated that he had chloroform. Kristin further testified that she was not sure whether defendant Hunt was present during the discussion about chloroform.

. . . .

Since waking up, Kristin had consumed one and a half pints of bourbon whiskey, and she continued to drink it in the bedroom. Kristin felt "fine" from drinking, and testified that it would take a liter for her to get drunk. Skuba, Wentzel, and Kristin were also smoking methamphetamine, which made Kristin feel "alert." She did not recall Hunt smoking. Hunt was working on music, and Kristin did not remember whether he was wearing headphones during the course of the day while he was in Skuba's bedroom.

After about an hour, Skuba asked Kristin to go upstairs and stated "he was going to handle some business." It was Kristin's understanding that the person who Skuba had previously talked about was coming over. Kristin testified that defendant Hunt remained downstairs while she and Wentzel went upstairs to a living room. Kristin's father and brother were already upstairs sleeping in a bedroom.

While upstairs in the living room, Kristin continued drinking whiskey and watched episodes of the television show "That's So Raven" with Wentzel. Kristin never mentioned in interviews with investigators that Wentzel was upstairs with her.

After Kristin went upstairs, she heard someone enter the front door and then heard Skuba's bedroom door shut. Skuba's bedroom had two doors, one of which led to the interior of the house, and a second door which led to an outdoor patio that was next to a door to the garage. While upstairs, Kristin eventually heard someone saying loudly, "'Please, don't. Stop.'" It was not the voice of Skuba or defendant Hunt. The person sounded frightened and the voice was muffled as though a hand was over the person's mouth. The upstairs living room where Kristin was located was on top of the garage and Skuba's bedroom, and the voice sounded like it was coming from the garage. Kristin testified that the struggle she heard occurred during the third episode of "That's So Raven," but she told investigators it occurred during the second episode.

Kristin heard "a bunch of banging around downstairs" for approximately five minutes. It sounded as though "somebody was getting in a fight," with "a bunch of movement" and "something was in the way and they knocked it over." Kristin paced back and forth, turned up the volume on the television, and said "'No, Skuba, no.'" She thought Skuba was involved in something downstairs with the person who had come over.

According to Kristin, her father and brother came out of the bedroom while the "banging" noise continued. Both were really mad, and Kristin's father was going to call 911. Kristin stopped him because she "didn't think that the situation would turn out the way it did and [she] didn't want to get [defendant Hunt] or [Skuba] in trouble." Kristin also told her brother to go back to sleep. According to her testimony at a prior hearing, Kristin tried to push her father and brother back into the bedroom, but at trial she did not remember trying to do so. Her father and brother eventually went downstairs and left the residence.

After the noise stopped, Kristin did not hear any further sounds from the garage. Skuba eventually came upstairs holding clothes. He was sweating and looked "freaked out." He proceeded to the third floor, started the washer, and then went back to the first floor. Kristin went downstairs about half an hour after she heard the struggle in the garage. Wentzel had left the residence.

While downstairs, Kristin heard water running in the bathroom. She knocked on the door and heard defendant Hunt say, "'I'm in here.'"

Kristin never mentioned this exchange with Hunt during her first interview with investigators, and indicated that she was not sure who was in the bathroom during her second interview with investigators.

Kristin saw Skuba on a patio outside his bedroom, so she joined him to have a cigarette for about 10 minutes. Skuba still looked sweaty and "freaked out." He was also wearing different clothes than when she saw him previously. Skuba told Kristin that the chloroform "didn't work," that "'[w]e got into a fight,'" and that the person was "knocked out" in the garage. Skuba never clarified who "we" referred to. Kristin assumed Skuba was referring to defendant Hunt "because he was the one there." In an initial interview with investigators, Kristin reported only that Skuba told her to "keep it solid," "don't say anything," and "don't go in the garage." While Kristin was standing outside with Skuba, she was eight to ten feet from the door of the garage. She did not hear any noise coming from the garage, or anything to suggest that there was someone alive in the garage.

Kristin went to the front of the residence and smoked another cigarette. She saw a big gold truck, with a camper shell, that she had never seen before. She went to the passenger seat to look for something to steal and saw cell phones. Skuba appeared and told her to get out of the truck. Kristin did not take anything and went back into the residence.

Kristin testified that she heard Skuba say on his cell phone, "'Hey, homeboy, get over here. I need your help.'" Kristin variously stated under oath and to investigators that Skuba stated before, during, or after this call that defendant Hunt had left. Skuba was upset. The phone call took place about half an hour after Kristin had smoked a cigarette on the patio with Skuba.

Defendant Clamp arrived at the residence about 15 minutes after the call. Kristin saw Clamp's red truck at the residence at some point. Clamp asked Skuba, "'What . . . is she doing here?'" Skuba responded with "something along the lines that [Kristin] was okay." In the ensuing conversation, Clamp indicated that he was upset that Skuba had "ripped . . . off" the victim with defendant Hunt and not with Clamp. Clamp also asked Skuba "if he could live with this for the rest of his life." Skuba said, "'Yes, he knows where my mom lives.'" Although Kristin testified that she was in the bedroom during this conversation, she previously told investigators that she was outside the room and that she had heard this portion of the conversation through the door. Kristin testified that Clamp next told her "to clean up the blood in the garage while they were gone." She previously told investigators that she did not know who asked her to clean up the blood.

Kristin eventually went back upstairs and outside onto a balcony. There was a strong smell of chemicals that Kristin had never smelled before. She saw Skuba outside walking to the garage with a big blue blanket. Kristin did not know where defendant Clamp was. Kristin heard the garage door open, a "dragging" sound, "a big thud" like someone was being put in the truck bed, and then the tailgate shut. She eventually heard the garage door close and the engines of

two "trucks reversing out of the driveway" "[m]aybe a little less" than an hour after she had gone to the upstairs balcony. She did not actually see the vehicles leave the residence. She testified at a prior proceeding that she heard only one vehicle and that she " 'assume[d]' " the other vehicle " 'went right behind it.' "

Kristin got some "409" cleaner from the kitchen and walked through Skuba's bedroom. She noticed items in the room that she had not seen earlier in the evening. There was a guitar, a laptop computer, and a wallet. In the wallet, Kristin found the victim's driver's license and more than four credit cards. There was also a duffle bag and boxes of "Green Bean" pills in the room. In testimony at a prior hearing, Kristin also stated that she saw marijuana. She previously told investigators, however, that she did not see marijuana until later.

At some point, Kristin cleaned up blood in the bathroom, where she saw "specks" of blood in the sink and on the floor.

. . . .

In the garage, Kristin saw a "bunch" of blood. In the back of the garage, there were "[s]pecks" of blood as though the blood "had gotten flung." Nearby was a "pool" of blood where most of the blood was in the garage. There was also a line of blood about six inches wide running the length of the garage, from the pool of blood in the back of the garage to the front where the garage door lifts up. Regarding this line of blood, Kristin testified that it looked like the blood had smeared while the victim was dragged with the blanket across the garage. Kristin dumped both bottles of cleaning fluid on the blood on the ground and used a towel and a torn T-shirt, which "was already there for" oil leaks, to clean up the blood. She then went back inside the residence.

Skuba and defendant Clamp returned to the residence after more than an hour, and defendant Hunt arrived at the residence 45 minutes after them. After Hunt arrived, Kristin never heard any statement by Skuba or defendants such as, """"Where have you been?"""" Kristin previously told investigators that she cleaned up the blood after Skuba and Clamp had returned to the residence.

There were 5 to 10 one-pound bags of marijuana, which was divided equally among Skuba, defendant Hunt, and defendant Clamp. The pills were also divided among the three men. Clamp put his portion of marijuana in a black North Face bag. By this point at least, Kristin was intoxicated from the alcohol and the methamphetamine.

Kristin testified that, when the marijuana was being divided, Skuba and defendant Hunt had a conversation about the chloroform not working, the victim getting "beat . . . up," and "one of them land[ing] on the other one." In an interview by investigators, Kristin indicated that the conversation did not take place that night and that she did not remember the specific time.

After the items were divided up, defendants Clamp and Hunt left Skuba's residence. Hunt never came back to the residence and

Kristin never saw him again.

Kristin later asked Skuba what they did with the victim. Skuba indicated that he had driven the victim's truck with the victim in the back, and that defendant Clamp "was right behind him in a red truck." Skuba stated that they went up the coast, "that they threw him off a cliff and that his body went thudding down." Skuba and Clamp then proceeded back to Skuba's residence.

Kristin testified that Skuba gave her a pound of marijuana in one bag, which was one-half of what he had, and some pills. She previously testified that Skuba gave her one bag of marijuana, and that he kept two bags. Kristin sold some of the marijuana and also gave some of the marijuana to her brother and her father.

Kristin testified that she had a cell phone but that it broke prior to July 20, 2009. Thereafter she could not make calls on the phone, but she could check her voicemail by calling from someone else's phone. When shown phone records reflecting calls from defendant Hunt's phone to her phone on July 21, 2009, at 12:58 a.m., 1:12 a.m., and 3:07 a.m., she testified that she did not recall receiving those calls and that she did not have any phone conversations with him that morning. When asked whether she remembered getting voicemail from Hunt, Kristin testified, "I didn't check it, I'm pretty sure, until way later."

### b. Timothy Wentzel's testimony

Timothy Wentzel testified that Skuba was a friend who regularly supplied methamphetamine to him and another friend, Felicia Wilkins. Wentzel was a "heavy user" of methamphetamine in July 2009, and used it every day. He stopped using methamphetamine in June 2010, about 11 months before trial. When Wentzel smoked methamphetamine, it made him paranoid and most of the time he heard and saw things that were not real. It also affected his memory, particularly his ability to remember things in chronological order, and affected his ability to keep track of time.

On the night of the incident, Wilkins dropped Wentzel off at Skuba's residence to buy methamphetamine. Wentzel went to Skuba's bedroom and saw Skuba, Kristin who was drinking alcohol, and defendant Hunt who was using the computer to work on music. During the entire time Wentzel was in Skuba's bedroom, Hunt had on headphones. Skuba, Wentzel, and possibly Hunt proceeded to smoke methamphetamine. After an hour, Skuba asked Wentzel and Kristin, but not Hunt, to go upstairs so he could "handle some business."

Wentzel and Kristin went upstairs, sat on a couch that was above the garage, and watched "That's So Raven" on television. Within the first half-hour episode, Wentzel heard a "ruckus, like someone was moving a lot of stuff around" or "knocked some stuff over" downstairs. Kristin turned up the television volume "to drown it out," and said, "'Skuba, don't. Skuba, don't. Why, Skuba?'" Kristin appeared very emotional to Wentzel and on the verge of tears. The banging and slamming noises grew louder. Wentzel was high at the time and felt paranoid, which made him think that he was

hearing things and that there were people outside trying to get in the house. He did not hear any voices from downstairs.

Senior and Junior came out of their room and argued with Kristin. Wentzel never saw Junior go to the balcony before the noise started. Senior and Junior eventually went downstairs, and Wentzel did not see them again.

Skuba came upstairs out of breath and told them he was "done with his business" and that they could go back downstairs. The noise had already stopped by this point. Wentzel exited the residence. He did not see Kenny Wayne that night, and he did not see any vehicles parked around Skuba's residence.

Thereafter, Wentzel smoked more methamphetamine with Wilkins at other locations. Wilkins and Wentzel called Skuba to see if "everything was okay." Skuba said he was "okay" and would call later. Wentzel testified that he never called Skuba thereafter and never saw Kristin or defendant Hunt again. Phone records reflect numerous calls between Wentzel's phone and Skuba's phone from July 16 to 30, 2009. There were also calls between Wentzel's phone and defendant Clamp. Wentzel testified that Wilkins had used his phone to talk to Clamp and Skuba.

### c. George Roberts, Sr.'s testimony

George Roberts, Sr. had been convicted of grand theft in 1985 and 1993 and vehicle theft in 1993. According to Senior, when Kristin drank alcohol, she would get hysterical and often exaggerated things. Senior's 17–year–old son, Junior, was having problems related to marijuana and had been homeless. Senior testified that during the July 2009 time period, he took what Kristin or Junior said "with a grain of salt."

. . . .

Senior and Junior began staying at Skuba's Felix Street residence before the incident occurred. A few days before the incident, Senior saw a little black bottle in Skuba's room. Skuba said it was chloroform. Senior jokingly told Skuba that Senior "would use chloroform" on a real estate agent that had "ripped [Senior] off."

On July 20, 2009, Senior went to bed about 8:30 or 9:00 p.m. He had taken medications that made him groggy and drowsy, and he had also used marijuana. Senior was awoken by Junior, who appeared agitated, excited, and hyper. Senior believed there was a "grave situation" downstairs based on Junior's statements about what he had heard. Junior indicated that it sounded like somebody was being "'killed'" or "'beaten up.'" Senior grabbed his phone, walked out of the room, and saw Kristin and Wentzel sitting on a sofa. Senior went to the stairs and asked Kristin what was "'going on'" and indicated that he was about to call 911. Kristin told him not to call 911, that it was just "'an argument,'" and that Senior should "'[g]o back to bed.'" Ultimately, Senior did not call 911 because he did not hear any disturbance, and because Kristin and Junior may have been under the influence and exaggerating things. At most, Senior heard a "furniture noise," such as a chair moving,

but no noise from downstairs that sounded like a fight.

Senior was upset at being woken up for what may have been nothing and because Kristin would not explain what was going on. He went back to his room, got dressed, and left the house. Senior did not want to be involved if something was going on. He did not hear anything outside. He saw a gold Toyota Tacoma pickup truck with a camper shell on it parked near the garage. Senior went to his own car for a few minutes, then took his dog for a walk. Junior accompanied Senior for the walk. Senior and Junior eventually returned to Senior's car. Prior to falling asleep in the car, Senior saw a red pickup pull into the driveway. Senior later woke up to see the red pickup and then the gold pickup leave. He did not see the driver of either vehicle. When Senior saw these vehicles, he did not see any red Mustang. He also did not see Kenny Wayne at Skuba's residence on the day of the incident.

### d. George Roberts, Jr.'s testimony

George Roberts, Jr. testified that he had "done a lot of drugs," specifically marijuana and methamphetamine, and that his memory had been affected by the drugs, among other things. He tried to stop using methamphetamine about two weeks before trial but had had two relapses. Junior was homeless and was worried about being viewed as a snitch for testifying at trial. According to Junior, if a person cooperates with the police, the person is viewed as a rat by others living on the street, and gets "beat down" and "kicked out of Santa Cruz."

Junior testified that on the day of the incident, he was smoking weed all day and got drunk. Before going to bed, he saw Kristin and "Tim." Junior fell asleep and then got up later to smoke a cigarette on a balcony. Junior observed three males outside. The first, who Junior only saw from behind, was wearing a brown golfer's hat. Junior later saw a missing person poster with Sorokin wearing a similar hat. The second person was Skuba. Junior previously reported to investigators that the third person was defendant Hunt, and he later stated it was Ken Hatfield. By the time of trial, Junior was not certain of the identity of the third person.

Junior went back to sleep but was awoken by a muffled noise which continued for 15 or 20 minutes. It sounded like someone was screaming with a hand over the mouth. Junior was worried, so he woke up Senior, who was groggy, and told him that it sounded like someone was getting "beaten up" downstairs. Senior exited the room and threatened to call the police. Kristin responded, "'No. No. No. You don't need to do that. Don't get involved in anybody else's business.'" Kristin tried to push both of them back into their room. Senior eventually exited the residence. Junior testified that he screamed at Kristin and asked what was going on, and that she slapped him after he refused to go back into his room. Junior eventually went to his room and gathered some of his clothes to leave.

When Junior went downstairs, he saw defendant Hunt walking out of Skuba's room. Hunt looked "a little jumpy" and as though he had just gotten in a fight. Junior asked, "'[D]o you know anything that's

9

going on?'" Hunt responded, "'Did you hear something?'" Junior said, "'A little bit.'" Hunt said, "'Don't worry about it,'" and walked into the bathroom. Junior saw Hunt look at himself in the mirror just before the bathroom door closed, and Junior heard "the sink turn on" and water running. Junior acknowledged that he could not have seen inside the bathroom from where he was standing at the foot of the stairs.

Junior went outside and saw in the driveway a newer "[s]ilverish" four-door Toyota truck with a shell on it. Junior tried to jump up to look through a little window in the garage door, but did not see anything. Junior walked about half a block from the residence when Skuba came up to him. Skuba looked "a little nervous and jumpy." He told Junior, who was crying because Kristin had slapped him, to stop crying and stated, "'I just did something to help you guys and I put both of our lives . . . in jeopardy.'" Skuba also stated something to the effect that "our money problems are solved now" and that they had "'obtained a pickup truck.'" Junior asked Skuba what he was talking about, but Skuba would not say what he had done.

Junior saw Skuba return to his residence, come outside with two rolling suitcases, load them into the front passenger seat of the truck, and drive away. Junior never saw anything loaded into the back of the truck. A red Mustang followed the truck. Ken Hatfield, who was also known as Kenny Wayne, drove a red Mustang, and Junior may have seen him at the residence before the incident. Junior never saw a red truck. At some point, Junior saw a smaller Toyota truck pull up and two males exit and walk toward the driveway. Junior did not recall whether this smaller truck left at the same time as the silver truck. After the silver truck left, Junior and Senior walked their dog and then returned to their car to sleep. Later, Junior went back inside Skuba's residence and Kristin gave Junior about an ounce of marijuana.

### e. Cell phone records

An intelligence analyst testified concerning various individuals' cell phone records. The analyst worked for a multi-agency task force that handled major drug cases and provided assistance to government agencies "when they need[ed] help with looking at a case and looking for patterns and trends," including phone patterns.

When a call is made on a cell phone, the call connects to one of multiple antennas on a cell phone tower. The resulting information provides "a general idea of where the call is made" although not the exact location. The exact range of a cell phone tower is difficult to determine and depends on topography, the amount of cell phone traffic, and other factors. When the cell phone records of the victim, Skuba, and defendants Clamp and Hunt were analyzed by the prosecution, it was assumed that the cell phone towers had a three mile radius.

On July 20, 2009, there were three calls between defendant Clamp's phone and Skuba's phone between 6:15 p.m. and almost 8:00 p.m.

The last call between the victim's phone and Skuba's phone was on July 21, 2009, at 12:31 a.m., with Skuba's phone being in an area of

Santa Cruz that included his Felix Street residence.

Thereafter, also on July 21, 2009, there were two phone calls between Skuba's phone and Clamp's phone at 1:01 a.m. and 1:03 a.m., and two more phone calls between the phones at 1:51 a.m. and 1:59 a.m. About an hour later, there were phone calls from Clamp's phone to Skuba's phone at 2:54 a.m. and 2:57 a.m. The phone records for these latter two calls were consistent with Clamp's phone moving westbound out of Santa Cruz on Highway 1 north. There was no other call activity on Clamp's phone for the next hour. There were also no further cell towers in the westerly direction that Clamp's phone was traveling.

Prior to 2:55 a.m., the phone records for Skuba's phone were consistent with him making calls from his residence on Felix Street. Between 2:55 and 2:58 a.m., there were four phone calls from Skuba's phone. The phone records were consistent with Skuba's phone moving westbound up Highway 1 out of Santa Cruz. One of the calls, at 2:57 a.m., was to Clamp's phone. By the time of the call at 2:58 a.m., Skuba's phone had continued moving and was west of the last cell phone tower. There was not another cell phone tower for some distance up the coast. The phone records of Skuba and defendant Clamp were consistent with the two of them traveling in separate vehicles westbound on Highway 1 north shortly before 3:00 a.m. For approximately the next hour, from 2:58 to 3:58 a.m., no calls were made from Skuba's phone, and all calls to his phone went to his voicemail. There was "the same void" of calls on Clamp's phone during that same time period. If a phone is turned off, or if it is out of range of a cell phone tower, a call to that phone will go to voicemail.

. . . .

At 3:57 a.m., Clamp's phone called an unknown phone. During the call, Clamp's phone was moving in an easterly direction, coming back into Santa Cruz on the west side. During the next call to the same phone number at 3:58 a.m., Clamp's phone continued moving in an easterly direction on southbound Highway 1.

At 3:56 a.m., a call was made from Hunt's phone to Skuba's phone. Hunt's phone was in an area of Santa Cruz that included Felix Street. Skuba's phone was moving in an easterly direction, coming back into Santa Cruz on the west side. Skuba's phone received another call at 4:02 a.m., and the phone records reflect that Skuba's phone was moving in an easterly direction down Highway 1. The analysis of defendant Clamp's and Skuba's phone records was consistent with the two of them returning in tandem back into Santa Cruz just before 4:00 a.m.

*Clamp*, 2014 WL 5499580, at *2-10.

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the

basis of a claim that was reviewed on the merits in state court unless the state court's adjudication

11

of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under Section 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *See Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000). In conducting its analysis, the federal court must presume the correctness of the state court's factual findings, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The state court decision to which § 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005). When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the Court looks to the last reasoned opinion. *See Nunnemaker* at 801-06; *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000). In this case the Court

looks to the opinion of the California Court of Appeal for all the claims in the petition.

As grounds for federal habeas relief, Clamp contends that: (1) there was insufficient evidence to support the conviction; (2) the trial court erred in admitting Kristin's testimony regarding Skuba's statements; and (3) the trial court erred by failing to instruct the jury on accessory liability.

### SUFFICIENCY OF THE EVIDENCE

Clamp first argues that there was insufficient evidence that the victim was alive when Clamp first became involved, therefore his convictions for robbery and murder must be reversed. He contends that his involvement began after the victim was killed. Respondent counters that the jury could have reasonably concluded from the evidence that the victim was still alive when Clamp became involved.

**Legal Standard**

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, *see Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, *see id*. at 324.

The Supreme Court has emphasized that "*Jackson* claims face a high bar in federal habeas proceedings . . . ." *Coleman v. Johnson*, 566 U.S. 650, 651, 655 (2012) (per curiam) (finding that the Third Circuit "unduly impinged on the jury's role as factfinder" and failed to apply the deferential standard of *Jackson* when it engaged in "fine-grained factual parsing" to find that the evidence was insufficient to support petitioner's conviction). A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1993). The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of

the crime beyond a reasonable doubt.'" *Payne*, 982 F.2d at 338 (quoting *Jackson*, 443 U.S. at

319). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt

has there been a due process violation. *Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d at 338.

**Discussion**

The California Court of Appeal denied this claim:

> Defendant Clamp and the Attorney General agree that Clamp arrived at Skuba's residence at least an hour to an hour and a half after the assault on the victim. This estimate is consistent with the evidence. As we explained above, the attack occurred between approximately 12:31 a.m. and 1:00 a.m., and Clamp arrived sometime after the calls with Skuba around 2:00 a.m.

> Substantial evidence supports a finding that defendant Clamp became involved while the victim was alive. Kristin testified that when she saw Skuba on the patio after the attack, he stated that the chloroform did not work, that a "fight" had occurred, and that the victim was "knocked out." Kristin's testimony that she did not hear any noises coming from the garage after the attack is consistent with Skuba's comment that the victim was "knocked out."

> Further, the conversation between defendant Clamp and Skuba after Clamp's arrival at the residence supports a finding that the victim was alive after the attack in the garage. According to Kristin, Clamp asked Skuba "if he could live with this for the rest of his life." Skuba stated, "'Yes, he *knows* where my mom lives.'" (Italics added.) The logical inference from Skuba's response is that the victim was still alive in the garage after the attack.

> Regarding the crime scene, Kristin testified that there was a "bunch" of blood in the garage, including "specks" that appeared to have been "flung" and a "pool" of blood that contained most of the blood. Although the exact amount of blood in the garage was not established, Kristin testified that she cleaned up the garage with two bottles of cleaner, along with a towel and a "torn T-shirt that was already there for" oil leaks[.] There was no evidence suggesting that the amount of blood lost by the victim necessarily meant the injury suffered by the victim was fatal.

> The criminalist from the state crime lab testified about the patterns of apparent blood in the garage but was not able to offer any opinion as to what happened to the victim. According to the criminalist, the blood patterns may have been the result of an impact from a beating with a hand or a tool, from being flung off an object, from a bludgeoning, and/or from a very fast force, such as a gunshot, baseball bat, or "high-speed machinery" like a chainsaw. The criminalist testified that an in-depth analysis of the blood spatter was not conducted, that experiments were required to determine the cause of some of the specks of suspected blood, and that, in the absence of a weapon or a wound on a body to examine, the information was limited as to determining what happened in the

14

garage.

However, the noises reported by the witnesses who heard the attack were consistent with a fight, rather than the use of a gun or "high-speed machinery" to attack the victim as suggested by the criminalist. Kristin testified that she heard "banging" noises, and that it sounded as though "somebody was getting in a fight," with "a bunch of movement" and "something was in the way and they knocked it over." Wentzel similarly testified that he heard a "ruckus, like someone was moving a lot of stuff around" or "knocked some stuff over," and that there were banging and slamming noises. Senior likewise testified that he heard a "furniture noise," such as a chair moving. Junior testified that it sounded as though someone was getting "beaten up."

In sum, substantial evidence supports a finding that the victim was alive immediately following the attack in the garage, in view of the witnesses' testimony about the noises emanating from the garage which were consistent with a fight not involving a gun or high-speed machinery; Skuba's comments to Kristin that the chloroform did not work, a "fight" had occurred, and the victim was "knocked out"; and Skuba's later conversation with defendant Clamp that included Skuba's statement that the victim "'*knows* where [Skuba's] mom lives.'" (Italics added.) Further, it was reasonable for the jury to infer that the victim was still alive when Clamp and Skuba had the discussion about the victim and when Clamp thereafter told Kristin to clean up the blood, because Clamp and/or Skuba had checked on the victim by going through the side door to the garage near Skuba's room, or because Skuba already knew the victim was still alive based upon the nature of the attack and the condition of the victim immediately thereafter. Indeed, given that the victim was alive immediately after the attack, it is not unreasonable to infer that Skuba at some point checked on the victim to make sure he was still knocked out before Skuba and Clamp had the discussion about what to do with the victim. In other words, the nature of the conversation between Skuba and Clamp supports an inference that at least one of them did check on the victim and that the victim was still alive at that time.

Although defendant Clamp acknowledges that this court "does not subjectively assess witness credibility," he nevertheless contends that Skuba's statements, including that the victim was knocked out and that the victim knew where Skuba's mom lived, came from Kristin who "was a weak, inconclusive, and questionable source." Clamp also points to Junior's testimony that Skuba stated to him outside the residence after the attack that their lives were "in jeopardy." Clamp contends that this statement, along with the lack of noise or movement in the garage, the nature of the assault, and the amount of blood and its pattern, "all point to [the victim] Sorokin either having died during the attack, or having survived for a very short time, and certainly not until Skuba dragged his body to the truck."

As the California Supreme court has explained, "'[c]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of

the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.' [Citation.]" (*Lee*, *supra*, 51 Cal. 4th at p. 632.) Further, "[t]hat the evidence might lead to a different verdict does not warrant a conclusion that the evidence supporting the verdict is insubstantial. [Citation.]" (*People v. Holt* (1997) 15 Cal. 4th 619, 669.) Reversal is warranted only if it appears "'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'" (*Bolin*, *supra*, 18 Cal. 4th at p. 331.) In this case, as we have explained, substantial evidence supports the finding that the victim was alive after the attack, including at the point when Clamp arrived and when he shortly thereafter told Kristin to clean up the blood. We therefore determine that Clamp's claim of insufficiency of the evidence does not warrant reversal of the judgment.

*Clamp*, 2014 WL 5499580, at *28-29.

Clamp's argument that there was insufficient evidence to show that the victim was still alive when he first became involved was rejected by the state court. To the extent Clamp argues that the state court was incorrect in its analysis of state law, he is not entitled to habeas relief. The *Jackson* standard must be applied with reference to the substantive elements of the criminal offense as defined by state law. *Jackson*, 443 U.S. at 324 n.16; *see, e.g.*, *Boyer v. Belleque*, 659 F.3d 957, 968 (9th Cir. 2011) (concluding it was not unreasonable, in light of Oregon case law, for Oregon court to conclude that a rational jury could find beyond a reasonable doubt that petitioner intended to kill his victim based on proof that he anally penetrated several victims with knowledge that he could infect them with AIDS). The state court's ruling on the state law issue is binding on this Court.

The "minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law," *Coleman*, 566 U.S. at 655, and Clamp has not shown that the state court was objectively unreasonable in finding sufficient evidence to support the conviction in light of the high bar for *Jackson* claims. While there was not overwhelming evidence that the victim was still alive when Clamp became involved, the state court decision finding that jurors could have concluded the victim was still alive was not objectively unreasonable.

A review of the record supports the state court determination. The codefendant's statement that the victim was "knocked out" and the conversation between Clamp and the codefendant about

16

whether the codefendant could "live with this for the rest of his life" and that the victim "knows" where the codefendant's mother lives, were sufficient for a rational juror to determine that the victim was still alive when Clamp became involved. Contrary to Clamp's argument, the amount of blood in the garage did not conclusively determine that the victim was dead.

Clamp has failed to demonstrate that the state court decision was objectively unreasonable in light of the high bar for sufficiency of the evidence claims on habeas review. This Court does not determine whether it is satisfied that there was sufficient evidence, only that viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements beyond a reasonable doubt. A review of the evidence demonstrates that jurors could have determined that the victim was still alive to support the convictions. The claim is denied.

## ADMISSION OF CODEFENDANT'S STATEMENTS

Clamp contends that the trial court erred by admitting Kristin's testimony describing Skuba's statements to her about Clamp's involvement in disposing of the victim's body. Skuba invoked his Fifth Amendment right not to testify and was found to be unavailable as a witness.

### Legal Standard

A person in custody pursuant to the judgment of a state court can obtain a federal writ of habeas corpus only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). A state court's evidentiary ruling therefore is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process. *See Pulley v. Harris*, 465 U.S. 37, 41 (1984).

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999). The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's

admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established Supreme Court precedent under § 2254(d)); *see Zapien v. Davis*, 849 F.3d 787, 794 (9th Cir. 2016) (because there is no Supreme Court case establishing the fundamental unfairness of admitting multiple hearsay testimony, *Holley* bars any such claim on federal habeas review).

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with the witnesses against him." U.S. Const. amend. VI. This federal confrontation right applies to the states through the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 403 (1965).

The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. *Crawford v. Washington*, 541 U.S. 36, 61 (2004). It commands not that evidence be reliable, but that reliability be assessed in a particular manner: by testing it in the crucible of cross-examination. *Id.*; *see Davis v. Alaska*, 415 U.S. 308, 315-16 (1974) (noting a primary interest secured by the Confrontation Clause is the right of cross-examination). The Confrontation Clause thus reflects a judgment, not only about the desirability of reliable evidence, but about how reliability can best be determined. *Crawford*, 541 U.S. at 61; *see, e.g.*, *United States v. Medjuck*, 156 F.3d 916, 919 n.1 (9th Cir. 1998) (Confrontation Clause serves purposes of ensuring that witnesses will testify under oath, forcing witnesses to undergo cross-examination, and permitting the jury to observe the demeanor of witnesses.); *Wood v. Alaska*, 957 F.2d 1544, 1549 (9th Cir. 1992) (the right to confrontation includes the right to cross examine adverse witnesses and to present relevant evidence).

Confrontation Clause claims are subject to harmless error analysis. *United States v. Nielsen*, 371 F.3d 574, 581 (9th Cir. 2004) (post-*Crawford* case); *see also United States v. Allen*, 425 F.3d 1231,1235 (9th Cir. 2005). For purposes of federal habeas corpus review, the standard applicable to violations of the Confrontation Clause is whether the inadmissible evidence had an actual and prejudicial effect upon the jury. *See Hernandez v. Small*, 282 F.3d 1132, 1144 (9th Cir. 2002) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)); *Webb v. Lewis*, 44 F.3d 1387, 1393 (9th Cir. 1994) (same). The standard on direct review of federal criminal convictions is

United States District Court
Northern District of California

"harmless beyond a reasonable doubt." *Nielsen*, 371 F.3d at 581.

**Background**

The California Court of Appeal discussed the relevant background for this claim:

> Defendant Clamp joined in a pretrial motion in limine by defendant Hunt to exclude statements by Skuba to Kristin. In the motion, Hunt contended, among other arguments, that Skuba's statements "must be limited to those statements specifically disserving of Skuba's interest" in order to be admitted as declarations against interest under Evidence Code section 1230, and that any statements admitted must be redacted to eliminate any reference to defendants. Relevant here, Hunt specifically referred to Skuba's statement to Kristin "that 'they' disposed of the body." To the extent the trial court was inclined to admit Skuba's statements, Hunt requested a hearing pursuant to Evidence Code sections 402, 403, and 702 to determine, among other things, what [Kristin] Roberts was claiming Skuba had told her.

> At a hearing prior to trial, Skuba invoked his Fifth Amendment right not to testify. The trial court found him to be an unavailable witness under Evidence Code section 240.

> After hearing argument from the parties concerning Kristin's anticipated testimony about out-of-court statements by Skuba and defendants, the trial court conducted a hearing (*see* Evid. Code, §§ 402–403). Kristin testified that after the marijuana was divided up and defendants had left Skuba's residence, Skuba told her what they had done with the victim. According to Kristin, Skuba stated that "they drove up north and threw his body off a cliff and he could hear it go thudding down the cliff." On cross-examination by Hunt's counsel, Kristin further testified: "[Skuba] said that he drove [victim] Elias'[s] truck and Clamp drove some other truck, followed him up north wherever they went and they threw the body off a cliff there. They could hear it thudding all the way down." When asked by Clamp's counsel whether Skuba provided any specifics about his conduct, Kristin testified: "Stewart [Skuba] drove [victim] Elias Sorokin's truck. Clamp followed him. They drove up the coast and they threw Elias Sorokin's body off the cliff and it went thudding down." Kristin further testified on cross-examination that Skuba did not provide a detailed description about the body being thrown off the cliff, and that he did not tell her "who was positioned where."

> The prosecution subsequently filed a motion to admit into evidence Skuba's statements on the ground that they were declarations against interest under Evidence Code section 1230. After hearing argument from counsel, the trial court explained that the statement concerning driving a body up, throwing it off a cliff, and the thudding sound was "clearly" a statement against interest. Based on the information elicited on cross-examination of Kristin at the pretrial hearing, the court believed that there was "no shifting of blame or responsibility" by Skuba to Clamp. The court told counsel that "it would be more appropriate to give you all a few hours to digest that and come back at 1:30 with your responses. [¶] But my tentative ruling would be to

19

admit the statement" that Skuba and Clamp "drove the body up and they threw the body up." The court cited several cases which were "the basis of [the court] ruling tentatively." The court told Clamp's counsel that "we'll take up your arguments at 1:30." The record on appeal does not reflect that Clamp's counsel made any further argument on the issue of the inadmissibility of Skuba's statement, or that the court issued a final ruling on the issue.

Kristin testified at trial, without objection from defendant Clamp, that she asked Skuba what "they did with [the victim]." Skuba told her that "they went up the coast," "[he] was driving Elias's vehicle and [Clamp] was right behind him in a red truck," "Elias was in the back of his truck," "they threw him off a cliff and they could hear his body go thudding down," and "[t]hey came back to [Skuba's]."

*Clamp*, 2014 WL 5499580, at *29-30.

**Discussion**

Respondent first argues that this claim is procedurally defaulted because Clamp abandoned the issue by failing to request a final ruling from the trial court. The California Court of Appeal held that Clamp abandoned the issue, yet the court still looked to the merits of the claim. This Court will forgo the procedural issue and also look to the merits of the claim. *See Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) (in the interest of judicial economy, the court may address a petition's merits without reaching procedural issues).

The California Court of Appeal discussed the relevant state law regarding the admission of such evidence and denied this claim. *Clamp*, 2014 WL 5499580, at *31-32. The state court found that admission of the statements did not violate state law. To the extent that Clamp argues that he is entitled to relief for a violation of state law, any such claim is denied. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (holding that mere errors in the application of state law are not cognizable on federal habeas corpus).

The California Court of Appeal also found that any error admitting the statements was harmless. The court stated:

Assuming one or more of Skuba's statements, such as the statement that "[defendant Clamp] was right behind him in a red truck," should have been excluded, we determine that the error was harmless under *People v. Watson* (1956) 46 Cal. 2d 818, 836–837 (*Watson*). (*See Duarte*, supra, 24 Cal. 4th at pp. 618–619.) Skuba's statements, as described by Kristin at trial, established that Skuba and Clamp drove up the coast in separate vehicles, that Skuba was driving with the victim in the victim's truck, that Skuba and Clamp disposed of the victim's body, and that they then returned to Skuba's

20

residence.

First, this testimony was essentially cumulative because other testimony by Kristin, combined with the cell phone records, established most of the same facts. For example, Kristin testified that she saw Skuba walk to the garage with a blanket, and that she heard the garage door open, a "dragging" sound, "a big thud" like someone was being put in the truck bed, and then the tailgate shut. She then heard two trucks reverse out of the driveway. Her descriptions of the gold and red trucks that she had earlier seen at Skuba's residence were consistent with the victim's truck and the truck for which defendant Clamp had keys. When Kristin subsequently went into the garage to clean it, the victim was not there. Kristin further testified that Skuba and Clamp returned to the residence after more than an hour, and that Hunt did not arrive until 45 minutes after them. The cell phone records were consistent with Skuba and Clamp traveling in separate vehicles on Highway 1 north about the same time, and with both of them being near the coast and out of the range of cell phone towers from about 3:00 a.m. to 4:00 a.m., whereupon the two of them returned in tandem to Santa Cruz. In contrast, Hunt's phone records were consistent with him remaining in the general area of Felix Street and downtown Santa Cruz between approximately 1:00 a.m. and 4:00 a.m.

We do not believe that the jury would have rejected this other testimony by Kristin (along with the corroborating cell phone records) which established Skuba's and defendant Clamp's movements with the victim, and instead relied on testimony by Kristin about Skuba's statements to establish the same facts. To the extent the jury believed Kristin, her testimony about Skuba's statements concerning Clamp's and his movements with the victim was essentially redundant. Kristin's testimony about Skuba's statements could only serve to buttress her other testimony and the cell phone records, and either the jury already found that other testimony credible or it did not; Kristin's vouching for her own testimony through statements attributed to Skuba would add nothing to the jury's credibility evaluation of Kristin.

Second, the specified statements by Skuba did not resolve one of the key issues raised by defendant Clamp—whether the victim was still alive at any point during Clamp's involvement. Rather, the specified statements by Skuba were inconclusive on the issue of whether the victim was still alive during the timeframe covered by Skuba's statements.

Third, defendant Clamp's involvement was demonstrated by independent and more convincing evidence than Kristin's testimony about what Skuba said. In addition to Kristin's testimony regarding Clamp's presence, statements, and conduct at Skuba's residence after the victim was attacked, the cell phone records just discussed indicate that Clamp's movements were coordinated with Skuba's following the removal of the victim from the residence. Further, testimony by investigators established that Clamp had gas cans in his room, which buttressed testimony that he was involved in burning the victim's truck. Also in Clamp's room was marijuana in a North Face bag, which was the same brand of bag that Clamp had

21

used to carry his share of the victim's marijuana from Skuba's residence, and green bean pills similar to the ones that Kristin brought to the motel. This evidence corroborated Kristin's testimony that Clamp had received a share of the victim's drugs, and strongly supported the inference that Clamp was involved in the crimes perpetrated against the victim. In sum, Clamp's level of involvement following the attack on the victim was more convincingly established by other evidence than Kristin's testimony concerning Skuba's statements.

Defendant Clamp suggests that his coordinated movements with Skuba after the victim was removed from the garage, as reflected in the cell phone records, "could simply have indicated that [Clamp] went home for a while" given that Clamp lived on the west side of Santa Cruz. Clamp does not cite any evidence to support the assertion that the movement of his cell phone at that time could be consistent with him going home. To the extent Clamp cites testimony concerning cell phone evidence that may be consistent with him being at his residence on the west side of Santa Cruz, the evidence pertains to calls on his phone between 5:00 a.m. and 7:00 a.m., which was at least an hour after he and Skuba had returned to Santa Cruz.

Defendant Clamp also argues that his "liability must be based on assisting Skuba in *disposing* of [the victim's] body," the prosecutor "consistently argued this theory," and that "[t]he only direct evidence of his involvement came from Kristin's testimony about Skuba's statements." (Italics added.) The record reflects, however, that the prosecutor argued aiding and abetting by Clamp at an earlier point in time. The prosecutor argued that Clamp, after he arrived at the residence, "immediately jump[ed] into this thing" involving marijuana as far as "need[ing] to get rid of" the victim. According to the prosecutor, Clamp aided, facilitated, promoted, encouraged, and/or instigated Skuba's commission of the robbery before they left the residence with the victim. For example, the prosecutor referred to Clamp's question to Skuba, about whether he could live with it for the rest of his life, as an indication of Clamp communicating, "yeah, I can do it, . . . just as long as you're not going to get weak on me at some point, let's do it." The prosecutor argued that Clamp must have had some conversation with Skuba indicating that Clamp would "go with" Skuba to "take [the victim] someplace." We also observe that Kristin testified that Clamp told her to clean up the blood in the garage before he and Skuba left the residence. In sum, there was evidence other than the statements at issue by Skuba that strongly pointed to Clamp's involvement in the incident well before the actual disposition of the victim's body.

Defendant Clamp also argues that this was a close case because the jury deliberated for "almost three days." As we have explained above regarding defendant Hunt's contentions, we are not persuaded that the length of deliberations in this case supports a finding of prejudicial error. Rather, given the extensive nature of the trial, the length of deliberations suggests a diligent and conscientious jury.

In sum, we conclude that it is not reasonably probable that a result more favorable to defendant Clamp would have been reached in the

absence of the purported error in admitting the specified statements by Skuba.  (*Watson*, supra, 46 Cal. 2d at pp. 836–837; *Duarte*, *supra*, 24 Cal. 4th at pp. 618–619.)

*Clamp*, 2014 WL 5499580, at *32-33.

If a state court finds an error harmless, that determination is reviewed under the deferential AEDPA standard.  This means that relief is not available for the error unless the state court's "*harmlessness determination itself* was unreasonable."  *Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015) (quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007)).  In other words, a federal court may grant relief only if the state court's harmlessness determination "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id*. (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  And if the federal court determines that the state court's harmless-error analysis was objectively unreasonable, it also must find that the error was prejudicial under *Brecht* before it can grant relief. *See Fry*, 551 U.S. at 119-20 (§ 2254(d)(1) did not displace *Brecht*).

Clamp has failed to demonstrate that the state court's harmless-error holding was objectively unreasonable.  Nor has he shown that the error was prejudicial under *Brecht*.  The state court noted how the testimony at issue was cumulative to other evidence that was presented regarding Clamp's involvement.  Witnesses observed Clamp at the scene and his truck was seen at the scene and then leaving with the codefendant and then returning.  The cell phone records also showed the times and approximate location of where Clamp was during various points in the evening.  There was also testimony independent of the disputed statements that Clamp received a portion of the drugs obtained from the victim and put them in a bag, which was later found in Clamp's room.

The disputed statements were cumulative of other evidence, so any error admitting the statements was harmless, and Clamp has failed to show that the state court's harmlessness determination was objectively unreasonable.  This claim is denied.

## JURY INSTRUCTIONS

Clamp argues that the trial court erred in failing to instruct the jury on accessory liability after the jury raised the issue during deliberations.

**Legal Standard**

A state trial court's refusal to give an instruction does not alone raise a ground cognizable in federal habeas corpus proceedings. *See Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988). The error must so infect the trial that the defendant was deprived of the fair trial guaranteed by the Fourteenth Amendment. *See id*. Due process requires that "'criminal defendants be afforded a meaningful opportunity to present a complete defense.'" *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). Therefore, a criminal defendant is entitled to adequate instructions on the defense theory of the case. *See Conde v. Henry*, 198 F.3d 734, 739 (9th Cir. 2000) (error to deny defendant's request for instruction on simple kidnaping where such instruction was supported by the evidence).

Due process does not require that an instruction be given unless the evidence supports it. *See Hopper v. Evans*, 456 U.S. 605, 611 (1982); *Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005). The defendant is not entitled to have jury instructions raised in his or her precise terms where the given instructions adequately embody the defense theory. *United States v. Del Muro*, 87 F.3d 1078, 1081 (9th Cir. 1996); *United States v. Tsinnijinnie*, 601 F.2d 1035, 1040 (9th Cir. 1979) *cert. denied*, 445 U.S. 966 (1980).

Whether a constitutional violation has occurred will depend upon the evidence in the case and the overall instructions given to the jury. *See Duckett*, 67 F.3d at 745. An examination of the record is required to see precisely what was given and what was refused and whether the given instructions adequately embodied the defendant's theory. *See Tsinnijinnie*, 601 F.2d at 1040. In other words, examining the record allows a determination of whether what was given was so prejudicial as to infect the entire trial and so deny due process. *See id*.

The omission of an instruction is less likely to be prejudicial than a misstatement of the law. *See Walker v. Endell*, 850 F.2d 470, 475-76 (9th Cir. 1987) (citing *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977)). Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an "'especially heavy burden.'" *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (quoting *Henderson*, 431 U.S. at 155).

**Background**

The California Court of Appeal discussed the relevant background for this claim:

> Defendant Clamp's counsel acknowledged making "a tactical decision" with Clamp during trial to decline a jury instruction regarding the crime of accessory after the fact. As the court later observed, defendant Clamp's counsel made the "tactical decision" to not seek an instruction regarding accessory liability under section 32, a lesser related offense, "even when [the prosecutor] requested it during" the jury instruction conference.

> After the jury had been instructed and during deliberations, the jury sent a note to the trial court stating: "There is some confusion about charges: [¶] . . . [¶] . . . Can Clamp be found guilty of another crime of 'accessory after the fact'?" The court met with the parties outside the presence of the jury and stated: "[T]he answer to that is no because that lesser related instruction was not requested." Defendant Clamp did not object to this proposed answer by the court and did not request any further instruction to the jury in response to the question. The court ultimately responded, "No," in writing to the jury.

> . . . .

> On appeal, defendant Clamp contends that the trial court committed prejudicial error by failing to "clarif[y] the jury's understanding of [accessory after the fact], and/or elaborat[ing] on its answer to ensure the jury correctly understood it, and thus understood what it had to determine to find [him] guilty." Clamp argues that the court must instruct on defense theories, and that he "essentially relied on having been an accessory as a defense, i.e. since the substantive offenses were complete before he arrived he could not be found guilty of them, because he only helped cover them up." Clamp further argues that, "what an accessory is, and how that related to [his] potential guilt, was a general principle of law governing the case, necessary for the jury to understand the case, and [his] theory of defense. At a minimum, the court should have clarified the jury's understanding, and further instructed to ensure [his] theory of defense was properly explained and presented."

*Clamp*, 2014 WL 5499580, at *34.

**Discussion**

Respondent argues that this claim is procedurally defaulted because Clamp forfeited this claim by first objecting to the giving of an accessory liability instruction when it was requested by the prosecution, and then not objecting when the trial court responded to the jury's question without giving it. The California Court of Appeal held that Clamp forfeited this claim. *Clamp*, 2014 WL 5499580, at *34. The California Court of Appeal still looked to the merits of the claim,

25

as will this Court.  The state court denied this claim, stating:

> Even if defendant Clamp has not forfeited the claim, he fails to persuade us that the trial court should have provided a different response.
>
> A trial court's response to jury questions is governed by section 1138, which provides: "After the jur[ors] have retired for deliberation, . . . if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court.  Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called." (§ 1138.)
>
> "[T]he statute imposes a 'mandatory' duty to clear up any instructional confusion expressed by the jury." (*People v. Gonzalez* (1990) 51 Cal. 3d 1179, 1212; *People v. Moore* (1996) 44 Cal. App. 4th 1323, 1331 [court must "help the jury understand the legal principles it is asked to apply"].)  However, "[t]his does not mean the court must always elaborate on the standard instructions.  Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information.  [Citation.]  Indeed, comments diverging from the standard are often risky.  [Citation.]" (*People v. Beardslee* (1991) 53 Cal. 3d 68, 97.)  "An appellate court applies the abuse of discretion standard of review to any decision by a trial court to instruct, or not to instruct, in its exercise of its supervision over a deliberating jury." (*People v. Waidla* (2000) 22 Cal. 4th 690, 745–746.)
>
> In this case, no abuse of discretion has been shown.  Defendant Clamp acknowledges that "the jury was properly instructed on the charged offenses."  At the same time, he explains that he "does not claim the court should have given a substantive accessory instruction that would have opened up the possibility of a conviction for that offense."  Consequently, given that the jury was properly instructed on the charged offenses, and given that those charged offenses did not include liability as an accessory, the court did not abuse its discretion in responding in the negative to the jury's question about whether Clamp could be found guilty of another crime of accessory after the fact.  The jury's question was clear and simple, and a short answer of "no" was warranted and sufficient.  Moreover, under the circumstances, we believe that inquiring into the jury's understanding of an accessory and instructing on principles of law concerning an accessory, as proposed by Clamp on appeal, would have introduced additional and irrelevant issues into the case by the court FN8 and potentially caused juror confusion.
>
> > FN8  We note that defendant Clamp argues on appeal that "the jury, without the issue having been mentioned, raised this legal issue on its own."  The record reflects, however, that defendant Clamp's counsel raised the issue of accessory after the fact in argument to the jury.  Counsel argued that, to

> the extent Clamp did anything after the victim was dead, "it's called an accessory after the fact. It's a different crime. . . . It's not the crimes he's charged with. . . . [Y]ou could argue that he would be guilty of coming along after the fact and helping . . . Skuba dispose of [the victim's] remains. Again, we don't have proof of that at all."

> We are also not persuaded by defendant Clamp's attempt to characterize the issue of an accessory as a "defense" that the trial court should have instructed on, and that the court's failure to do so violated his federal constitutional rights. Being an accessory to a robbery is not a defense to robbery. Rather, being an accessory is a separate criminal offense. (§ 32; *People v. Jennings* (2010) 50 Cal. 4th 616, 668 (*Jennings*) ["Being an accessory to murder is not a defense to aiding and abetting the commission of murder—it is a separate criminal offense"].) A defendant may be convicted of both robbery and being an accessory to robbery if the defendant aids the principal both before and during, as well as after, the robbery is committed. (*See Jennings, supra,* at p. 668.) In this case, an issue for the jury was whether defendant's involvement occurred before or after the victim's death. Receiving instructions on accessory principles, which pertain to a defendant's conduct after a felony has been committed, would not have assisted the jury in the determination of when the victim died. Defendant fails to demonstrate error in the court's succinct response to the jury's note.

*Clamp*, 2014 WL 5499580, at *34-35.

To the extent that Clamp argues that there was a violation of state law, he is not entitled to federal habeas relief. *See Estelle*, 502 U.S. at 67-68. Nor has Clamp shown that if there was an error, the error so infected the trial that his right to a fair trial was violated. Nor has he shown that he was prevented from presenting a complete defense due to the lack of the jury instruction.

Clamp argues that being an accessory was a defense in his case. The California Court of Appeal noted that under California law being an accessory is not a defense but a crime and had an accessory instruction been given then Clamp could have been convicted of that additional crime. The state court held that Clamp was not deprived of his ability to present a defense by the trial court's omission of this instruction. This determination was not objectively unreasonable. Clamp was able to present a defense that he did not become involved in the crime until after the victim was killed, and his attorney argued this to the jury. The jury found that the victim was still alive when Clamp became involved and there was sufficient evidence to make this determination, as noted in the first claim above. Clamp has failed to show how the omission of this jury instruction,

which his attorney made a tactical decision to decline, prevented him from presenting a defense. [3]
His conclusory arguments do not counter the state court's decision. Even if the trial court erred in
failing to give the instruction, Clamp has not shown that the error had a substantial and injurious
effect or influence in determining the jury's verdict. *See Brecht*, 507 U.S. at 637. There was
sufficient evidence for the jury to conclude that Clamp was involved with killing the victim. This
claim is denied.

## CERTIFICATE OF APPEALABILITY

The federal rules governing habeas cases brought by state prisoners require a district court
that issues an order denying a habeas petition to either grant or deny therein a certificate of
appealability. *See* Rules Governing § 2254 Cases, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a
substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the
certificate must indicate which issues satisfy this standard. *Id*. § 2253(c)(3). "Where a district
court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c)
is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district
court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S.
473, 484 (2000).

Here, petitioner has made no showing warranting a certificate.

## CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is **DENIED**. A certificate
of appealability is **DENIED**. *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

**IT IS SO ORDERED.**

Dated: February 8, 2018

_____
JAMES DONATO
United States District Judge

---

[3] Clamp has not raised a claim that his attorney was ineffective for this tactical decision.
Regardless, he could not demonstrate prejudice to support such a claim.

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KENNETH K. CLAMP,

            Plaintiff,

    v.

CLARK DUCART,

            Defendant.

Case No.  16-cv-06031-JD

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on February 8, 2018, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Kenneth K. Clamp
P.O. Box 7500
#G61486
Crescent City, CA 95532

Dated: February 8, 2018

Susan Y. Soong
Clerk, United States District Court

By: *Lisa R. Clark*
LISA R. CLARK, Deputy Clerk to the
Honorable JAMES DONATO